1
2
3
4
5
6

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

7
8
9
10
11
12
13

| | |
|---|---|
| VENESSA HUNTINGTON, ) | |
| ) | |
| Plaintiff, ) | Case No.  2:13-cv-00015-JCM-PAL |
| ) | |
| vs. ) | **REPORT OF FINDINGS AND** |
| ) | **RECOMMENDATION** |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | (Mtn to Remand - Dkt. #14) |
| ) | (Mtn to Affirm - Dkt. # 15) |
| Defendant. ) | |
| _____ ) | |

14
15
16
17

        This case involves judicial review of administrative action by the Commissioner of Social

Security denying Plaintiff Venessa Huntington's claim for Supplemental Security Income ("SSI")

benefits under Title XVI of the Social Security Act (the "Act").

## BACKGROUND

18
19
20
21
22
23
24
25

        On June 8, 2010,[1] Plaintiff filed her application for SSI benefits, alleging she became disabled

on January 1, 2003.  AR[2] 109.  Plaintiff subsequently amended her disability onset date to October 27,

2008.  AR 29.  The Social Security Administration ("SSA") denied Plaintiff's application initially and

on reconsideration.  AR 62-65, 69-71.  A hearing before an Administrative Law Judge ("ALJ") was

held on October 5, 2011.  AR 24-51.  In a decision dated November 21, 2011, ALJ David Gatto found

Plaintiff was not disabled.  AR 13-20.  Plaintiff requested review of the ALJ's decision by the Appeals

/ / /

26
27
28

_____

        [1] The ALJ's decision states that Plaintiff filed her Application on May 25, 2010.  AR 13.  This is
an error.  *See generally* Application for SSI Benefits (AR 109-116).

        [2] AR refers to the Administrative Record, which was delivered to the undersigned upon the
Commissioner's filing of her Answer (Dkt. #11) on May 7, 2013.

1    Council.  AR 7.   The ALJ's decision became the Commissioner's final decision when the Appeals

2    Council denied review on November 7, 2012.  AR 1-3.

3            On January 4, 2013, Plaintiff filed an Application to Proceed In Forma Pauperis (Dkt. #1) and

4    submitted a complaint in federal court, seeking judicial review of the Commissioner's decision pursuant

5    to 42 U.S.C. § 405(g).  The court screened Plaintiff's Complaint (Dkt. #4) pursuant to 28 U.S.C. § 1915

6    and directed the Clerk of Court to file it.  The Commissioner filed her Answer (Dkt. #11) on May 7,

7    2013.  Plaintiff filed a Motion for Remand (Dkt. #14) on June 14, 2013.  The Commissioner filed a

8    Cross-Motion to Remand and Opposition (Dkt. #15) on July 15, 2013.  The court has considered the

9    Motion for Remand and the Cross-Motion to Remand and Opposition.

10                                         **DISCUSSION**

11   **I.     Judicial Review of Disability Determination**

12           District courts review administrative decisions in social security benefits cases under 42  U.S.C.

13   § 405(g).  *See Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).  The statute provides that after

14   the Commissioner of Social Security has held a hearing and rendered a final decision, a disability

15   claimant may seek review of the Commissioner's decision by filing a civil lawsuit in federal district

16   court in the judicial district where the disability claimant lives.  *See* 42 U.S.C. § 405(g).  That statute

17   also provides that the District Court may enter, "upon the pleadings and transcripts of the record, a

18   judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with

19   or without remanding the cause for a rehearing."  The Ninth Circuit reviews a decision of a District

20   Court affirming, modifying, or reversing a decision of the Commissioner de novo.  *Batson v.*

21   *Commissioner*, 359 F.3d 1190, 1193 (9th Cir. 2003).

22           The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42

23   U.S.C. § 405(g); *see also Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005).  However, the

24   Commissioner's findings may be set aside if they are based on legal error or not supported by

25   substantial evidence.  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); *see also*

26   *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The Ninth Circuit defines substantial evidence

27   as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable

28   mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

Cir. 1995); see also *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n. 1 (9th Cir. 2005).  In determining whether the Commissioner's findings are supported by substantial evidence, the court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); see also *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

Under the substantial evidence test, the Commissioner's findings must be upheld if supported by inferences reasonably drawn from the record. *Batson,* 359 F.3d at 1193.  When the evidence will support more than one rational interpretation, the court must defer to the Commissioner's interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also Flaten v. Sec'y of Health and Human Serv.,* 44 F.3d 1453, 1457 (9th Cir. 1995).  Consequently, the issue before the court is not whether the Commissioner could reasonably have reached a different conclusion, but whether the final decision is supported by substantial evidence.

It is incumbent on the ALJ to make specific findings so that the court does not speculate as to the basis of the findings when determining if the Commissioner's decision is supported by substantial evidence.  Mere cursory findings of fact without explicit statements as to what portions of the evidence were accepted or rejected are not sufficient. *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981).  The ALJ's findings "should be as comprehensive and analytical as feasible, and where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Id.*

## II.     Disability Evaluation Process

The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The claimant must provide "specific medical evidence" to support his or her claim of disability.  If a claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *Batson*, 157 F.3d at 721.

The ALJ follows a five-step sequential evaluation process in determining whether an individual is disabled. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). If at any step, the ALJ makes a finding of disability or non-disability, no further evaluation is required. *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). The first step requires the ALJ to determine whether the individual is currently engaging in substantial gainful activity ("SGA"). *See* 20 C.F.R. §§ 404.1520(b) and 416.920(b). SGA is defined as work activity that is both substantial and gainful; it involves doing significant physical or mental activities, usually for pay or profit. *See* 20 C.F.R. §§ 404.1572(a)-(b) and 416.972(a)-(b). If the individual is currently engaging in SGA, then a finding of not disabled is made. If the individual is not engaging in SGA, then the analysis proceeds to the second step.

The second step addresses whether the individual has a medically-determinable impairment that is severe or a combination of impairments that significantly limits him or her from performing basic work activities. *See* 20 C.F.R. §§ 404.1520(c) and 416.920(c). An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the individual's ability to work. *See* 20 C.F.R. §§ 404.1521 and 416.921; Social Security Rulings ("SSRs") 85-28, 96-3p, and 96-4p.[3] If the individual does not have a severe medically-determinable impairment or combination of impairments, then a finding of not disabled is made. If the individual has a severe medically-determinable impairment or combination of impairments, then the analysis proceeds to the third step.

Step three requires the ALJ to determine whether the individual's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. If the individual's impairment or combination of impairments meet or equal the criteria of a

---

[3] SSRs are the SSA's official interpretations of the Act and its regulations. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1). They are entitled to some deference as long as they are consistent with the Act and regulations. *See Bray,* 554 F.3d at 1223 (finding ALJ erred in disregarding SSR 82-41).

listing and meet the duration requirement (20 C.F.R. §§ 404.1509 and 416.909), then a finding of disabled is made.  *See* 20 C.F.R. §§ 404.1520(h) and 416.920(h).  If the individual's impairment or combination of impairments does not meet or equal the criteria of a listing or meet the duration requirement, then the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the ALJ must first determine the individual's residual functional capacity ("RFC").  *See* 20 C.F.R. §§ 404.1520(e) and 416.920(e).  RFC is a function-by-function assessment of the individual's ability to do physical and mental work-related activities on a sustained basis despite limitations from impairments.  *See* SSR 96-8p.  In making this finding, the ALJ must consider all the relevant evidence such as symptoms and the extent to which they can reasonably be accepted as consistent with the objective medical evidence and other evidence. *See* 20 C.F.R. §§ 404.1529 and 416.929; SSRs 96-4p and 96-7p.  To the extent that statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.  The ALJ must also consider opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

The fourth step requires the ALJ to determine whether the individual has the RFC to perform his past relevant work ("PRW").  *See* 20 C.F.R. §§ 404.1520(f) and 416.920(f).  PRW means work performed either as the individual actually performed it or as it is generally performed in the national economy within the last fifteen years or fifteen years prior to the date that disability must be established. In addition, the work must have lasted long enough for the individual to learn the job and to perform it as SGA.  *See* 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), and 416.965.  If the individual has the RFC to perform his past work, then a finding of not disabled is made.  If the individual is unable to perform any PRW or does not have any PRW, then the analysis proceeds to the fifth and final step.

Step five requires the ALJ to determine whether the individual is able to do any other work considering his residual functional capacity, age, education, and work experience.  20 C.F.R. §§ 404.1520(g) and 416.920(g).  If he or she can do other work, then a finding of not disabled is made. Although the individual generally continues to have the burden of proving disability at this step, a

limited burden of going forward with the evidence shifts to the Commissioner.  The Commissioner is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the individual can do.  *Yuckert*, 482 U.S. at 141-42.

## II.   **Factual Background.**

### A.   **Testimony at Administrative Hearing.**

Plaintiff appeared and testified before ALJ David Gatto in Las Vegas, Nevada, on October 5, 2011, with her attorney, Nicole Steinhouse.  AR 24-51.  Vocational Expert Bernard Preston also appeared and testified.  *Id.*

Plaintiff was born on September 22, 1977, and at the time of the administrative hearing, she was thirty-four years old.  AR 109.  Plaintiff has a Nevada identification card, but stated she never had a driver's license.  AR 31.  Plaintiff obtained her GED in 1998.  AR 30, 132.  Plaintiff was last employed in 2000 as a cashier.  AR 33, 139.  Plaintiff stated she quit because it became harder for her to do things that were required of the job.  AR 33, 146.   Plaintiff's income was supplemented by AFDC until she married her husband in 2005, who is now the family's sole support.  AR 32, 146.  At the time of the hearing, her husband was employed in retail and security.  AR 32.  Plaintiff lives with her husband and four children.  AR 31, 146.

Plaintiff testified she is unable to work due to the following impairments; pseudo tumor cerebri, deep vein thrombosis, hypertension, arthritis in the knees, weak ankles, heel spurs, morbid obesity, vertigo, hyperthyroidism, and Grave's disease.  AR 24-51.  Plaintiff testified she was diagnosed in 2005 with intercranial hypertension, but believes she had the condition two years prior in 2003.  AR 29-34.  Plaintiff stated she was treated with Diamox, which alleviated her symptoms until they returned in 2008.  AR 34.  Plaintiff stated her ophthalmologist found decreased peripheral vision because of the pressure in her head and he recommended a neurosurgeon to determine if a stent would relieve the pressure.  AR 35.  Plaintiff explained that this condition made it difficult for her to concentrate.  AR 44.  For example, Plaintiff testified she could read or watch television for about two hours before her head would begin to ache and she would need to rest.  AR 44.

Plaintiff testified she also suffered from blood clots that continue to be treated with Warfarin.  AR 39.  Plaintiff stated she suffered from neuropathy in her legs, which caused a "prickling" sensation

that does not subside until her legs are straightened.  AR 40.  Plaintiff also testified she suffered from posterior orthostatic tachycardia, which caused her heart rate to increase significantly when she stood for more than five or ten minutes.  AR 42.  However, Plaintiff acknowledged she was on medication for this condition and that "the medication helps."  AR 42.

On a normal day, Plaintiff testified that she woke up around 6 a..m. to help her four children get ready for school.  AR 31.  Plaintiff stated once the children left by 8:30 a.m., she did not "spend much time doing anything."  AR 31.  Plaintiff said she watched television with her legs up, got up to go to the bathroom, and made lunch for herself around 11 or 11:30 a.m.  AR 31.  Around 1 p.m. Plaintiff stated she took a nap because the Diamox would make her very sleepy.  AR 32.  Plaintiff testified she did not do any housework because when she bent over she would tend to fall and injure herself.  AR 31.  Plaintiff said she fell and broke her ankle about a year and a half prior to this hearing and was recently given a walker and cane to assist her.  AR 31-32.

Vocational expert Bernard Preston also testified.  AR 45-50.  He described Plaintiff's PRW as a cashier as unskilled, light work.  AR 46.  The ALJ asked whether a woman with a high school education and impairments of pseudo tumor cerebri, a post thyroidectomy with a diagnosis of hyperthyroidism, degenerative joint disease and a history of migraine headaches could work a sedentary career, occasionally lifting up to ten pounds, frequently lifting less than ten pounds, standing and walking two hours out of an eight hour day, and sitting about six hours in an eight hour day.  AR 46.  Mr. Preston responded that this hypothetical woman could not perform Plaintiff's PRW.  AR 46.

The ALJ then asked Mr. Preston if there was any work the hypothetical woman could perform if additional limitations of no exposure to heights, moving machinery, or temperature extremes were added.  AR 47.  Mr. Preston testified that this hypothetical woman would be able to perform the following work; Callout Operator, an unskilled sedentary position with 209 Nevada positions and 15,851 national positions, Order Clerk, an unskilled sedentary position with 149 Nevada positions and 18,794 national positions, and Information Clerk, an unskilled sedentary position with 741 Nevada positions and 84,286 national positions.

/ / /

/ / /

7

1

      **B.**      **Plaintiff's Medical Records.**

2

          **1.**      **Kaiser Permanente Medical Group**

3

Plaintiff reported that between January 1992 and August 2008, she had her blood work, x-rays, a

4

spinal tap, MRI's, CT scan, and thyroid surgery at Kaiser Permanente Medical Group, located in

5

Anaheim, California.  AR 137. None of the Kaiser medical records are in the AR.

6

          **2.**      **Fremont Medical Centers**

7

On October 27, 2008, Plaintiff was treated for chest palpitations and dizziness at Fremont

8

Medical Center.  AR 269.  In November 2008, Plaintiff was treated again for heart palpitations.  AR

9

135.  During this visit, Plaintiff had an echocardiogram ("EKG") and sleep test conducted.  AR 135.

10

On December 9, 2008, Plaintiff was treated for chest pain, orthostatic hypotension, hypothyroidism, an

11

elevated white blood cell count, and gastrointestinal and deep venous thrombosis.  AR 231.  On January

12

14, 2009, Plaintiff was treated for redness and swelling to her right leg calf.  AR 223.

13

          **3.**      **Sunrise Hospital**

14

On October 27, 2008, Plaintiff was admitted to Sunrise Hospital for heart palpitations.  AR 207,

15

251.  On December 30, 2008, Plaintiff was treated for right leg weakness and numbness.  AR 253.  On

16

January 16, 2009, Plaintiff was treated for swelling and pain in the right calf.  AR 205.  On January 22,

17

2009, Plaintiff was treated for cellulitis of the foot.  AR 203.  Plaintiff had the following tests

18

performed between January 16, 2009 and January 23, 2009; an EKG, cardiac catheterization, stress test,

19

tilt test, and x-rays.  AR 136, 202.

20

On March 4, 2009, Plaintiff was diagnosed with superficial thrombophlebitis with cellulitis.

21

AR 198.  Plaintiff's additional diagnoses as listed by the treating physician were: recurrent superficial

22

thrombophlebitis with infection, Grave's disease, palpitations, hyperthyroidism after Grave's disease

23

treatment, non-cardiac chest pain, abnormal stress test, normal cardiac catheterization, pseudo tumor

24

cerebri, orthostatic hypotension, postural tachycardia, and a history of appendectomy.  AR 198.

25

Plaintiff had superficial blood clots with phlebitis, an ultrasound of her lower legs, and blood tests on

26

September 20, 2009.  AR 136, 186-188.  Plaintiff was also treated for a broken right ankle from a fall

27

she sustained on September 11, 2009.  AR 136, 189.

28

/ / /

On October 24, 2009, Plaintiff received a primary diagnosis of pseudo tumor cerebri and a headache.  AR 173.  Plaintiff also received a secondary diagnosis of hypothyroidism, Grave's disease, a history of orthostatic hypotension, postural tachycardia, varicose veins, and gastroesophageal reflux disease.  AR 173.  A CT scan of Plaintiff's head was performed on October 24, 2009, that revealed no acute changes.  *Id*.  An MRI of Plaintiff's head was also performed that showed no acute infarction, hemorrhage, or mass effect.  AR 173.  On October 25, 2009, Plaintiff was given discharge medications of: Diamox, Synthroid, Inderal, Coumadin, Vicodin, and Triamterene.  AR 173. On November 17, 2009, Plaintiff was treated for pain behind the right and left eye, in the occipital region.  AR 168.  Plaintiff was given Dilaudid and discharged when she advised the pain subsided.  AR 169-171.  In January 2010, Plaintiff was treated for severe headaches and doctors determined her pseudo tumor cerebri had returned.  AR 136.

### 4.   Dr. Teresa Charniga (Physician's Medical Center)

Plaintiff recalled that she started seeing her primary care physician Dr. Teresa Charniga in January 2009. AR 134.  However, the first record of treatment from Dr. Charniga was June 17, 2009, where Plaintiff complained of severe persistent leg pain that had been occurring for six months.  AR 311.  More specifically, Plaintiff had calf pain, swelling of her extremities, abdominal pain, thyroid problems, and a rapid heart rate upon standing.  AR 312.  Plaintiff had a history of low blood pressure, Thyroid disease, and blood clots.  AR 309.  Plaintiff was approximately 66 inches tall, weighed 342 pounds and was diagnosed with hypothyroidism, morbid obesity, venous thrombosis, lower limb superficial vessel phlebitis, abdominal pain and palpitations.  AR 313.  Plaintiff was prescribed Motrin for the phlebitis, Nexium for the abdominal pain and Propranolol for the palpitations.  *Id*.

Plaintiff followed up with Dr. Charniga approximately two weeks later on July 1, 2009, to discuss diagnostic procedure results.  AR 309.  The assessment notes only stated that there would be follow up in one week for blood test results.  AR 310.  Plaintiff was still being treated with the Motrin for her phlebitis, Nexium for her abdominal pain, Propranolol for her palpitations and Synthroid for hypothyroidism.  AR 309.

.   On July 8, 2009, Plaintiff was seen to discuss her lab results.  AR 307.  Plaintiff's prescriptions for her conditions remained unchanged except for a new diagnosis of edema, for which she was

prescribed Dyazide.  AR 308.  The assessment notes did not detail the current lab results, but did state there would be follow up in two weeks to review further lab results.  *Id*.

Approximately two weeks later on July 22, 2009, Plaintiff returned to discuss her test procedure results and complained that she believed her pseudo tumor cerebri was coming back.  AR 304. Plaintiff's physical exam showed she was alert, cooperative, and obese.  AR 305.  Plaintiff was assessed with abdominal pain, a headache, venous thrombosis, morbid obesity and hypothyroidism.  *Id*. The assessment notes show that Dr. Charniga referred Plaintiff to a gastroenterologist and neurologist, but her medications, which included Dyazide, Propranolol, Motrin, Nexium and Synthriod, remained unchanged.  *Id*.

Plaintiff did not see her primary care physician again until September 23, 2009, after a hospital stay for an ankle fracture, where she was treated with Coumadin.  AR 302.  The patient notes stated she had no complaints at that time.  *Id*.  Plaintiff continued to be treated with the same medications for her venous thrombosis, morbid obesity, hypothyroidism and edema.  AR 303.  Plaintiff continued to have weekly follow up exams during the month of October 2009.  Plaintiff stated she had no complaints of pain, however she was prescribed Lortab for pain in her lower legs.  AR 296.  Additionally, Plaintiff was prescribed Align for her gastrointestinal symptoms, which she acknowledged was effective two weeks later in relieving her symptoms.  AR 292-295.  Plaintiff was also referred to a neurologist, however the treatment notes stated Plaintiff was unhappy with the doctor that she saw, so another referral was made.  AR 291.

Plaintiff's medical records show that she had monthly visits with Dr. Charniga from March until June 2010.  AR 279-286.  Plaintiff's chief complaints during this period were leg pain and headaches. AR 279-281.   Plaintiff continued her medications of Coumadin, Amoxil, Align, Synthroid, Dyazide, and Acetazolamide for her morbid obesity, hypothyroidism, venous thrombosis, headaches, pseudo tumor cerebri, and pain in her limbs.  AR 279-286.  During this period, Dr. Charniga made referrals to a vascular surgeon for varicose veins and to Dr. Chopra at Plaintiff's request, but there were no further complaints noted.  AR 280.

/ / /

/ / /

1            **5.**    **Dr. Robert Hurwitz (Diagnostic Imaging of Southern Nevada)**

2        Plaintiff was seen for a series of upper gastrointestinal tests on June 26, and October 22, 2009.

3  AR 164.  The doctor's report showed mild hepatomegaly and gastroesophageal reflux without  hernia,

4  with a normal stomach and duodenum.  *Id*.  The liver was mildly enlarged, but the doctor noted the

5  study was otherwise normal.  If pain persisted, Dr. Hurwitz recommended a CT scan of the abdomen

6  and pelvis, however there were no further records.  AR 165.

7            **6.**    **Dr. Robert Baker** (**Nevada Cardiology Associates)**

8        On July 8, 2010, Plaintiff was referred by Dr. Charniga to Dr. Robert Baker, a board certified

9  cardiologist, to be treated for palpitations, dizziness, and a decrease in energy level.  AR 342.  During

10  this visit, Plaintiff denied any significant chest pain or fevers and chills and her condition was described

11  as pleasant, in no acute distress, alert and oriented.  AR 343.  The doctor's notes stated that Plaintiff

12  was still being evaluated for her pseudo tumor cerebri, and that he would follow up with her in two

13  weeks.  AR 344.  On July 21, 2010, Plaintiff returned for her follow-up visit still complaining of

14  dizziness, palpitations, and decreased energy levels.  AR 346.  However, Plaintiff again denied any

15  significant chest pain, fever or chills, but did state she had palpitations.  *Id*.  The treatment notes stated

16  that Plaintiff's blood pressure was under reasonable control and that she had no active congestive heart

17  failure based upon his exams or upon her symptoms.  AR 347.

18        On August 4, 2010, Plaintiff returned for her follow up visit and stated her energy level had

19  improved.  AR 350.  However, Plaintiff still complained she had dizziness.  AR 350.  Dr. Baker

20  increased Plaintiff's metoprolol from 50 to 75 mg, which had the desired effect of reducing her

21  tachycardic symptoms.  AR 351.  Dr. Baker noted that no further changes would be made to her

22  treatment plan and that he did not need to see Plaintiff again until eight weeks later for follow up.  AR

23  352.

24        From October 11, 2010, to May 11, 2011, Plaintiff had five doctor visits where she stated she

25  was still dizzy and winded when she stood up, but that her energy levels had improved.  AR 354-403.

26  Plaintiff was diagnosed with peripheral neuropathy.  AR 360.  In his treatment notes, Dr. Baker stated

27  he considered a stress test for chest pain, but that it had not been an issue so he did not perform the test.

28  *Id*.  Plaintiff also stated she was feeling better with the metoprolol and the midodrine, which indicated

1   her conditions were treatable with medication.  AR 360.  Dr. Baker stated he would see Plaintiff again

2   in three to four months to follow up on her complaints of dizziness.  AR 406.

3          Plaintiff returned for follow up with Dr. Baker on May 11, 2011, where he noted that she

4   continued to be compliant with her medications and as a result had no complaints, except for her

5   continued dizziness. AR 401.  Dr. Baker noted that Plaintiff was losing her vision, but she was seeing

6   an ophthalmologist for the condition.  AR 403.  Once again, Dr. Baker stated he would see Plaintiff

7   again in three to four months to follow up on her complaints of dizziness.  *Id*.  When Plaintiff returned

8   on September 21, 2011, she was assessed with hypertension, mitral valve disorder and palpitations, AR

9   400.  Plaintiff was monitored with a Holter monitor which showed the predominant rhythm of the heart

10   was normal.  AR 397.   Plaintiff's subjective assessment was noted as follows: no significant chest pain,

11   pressure, or tightness; her energy level was good, she was getting more shortness of breath, but she did

12   not have any other significant symptoms.  AR 398.

13                 7.    **Dr. Khalid Kamal**

14          On August 10, 2010, Plaintiff was assessed by Dr. Khalid Kamal, a consulting physician.  AR

15   334-341.  Plaintiff's chief complaints were postural orthostatic tachycardia, pseudo tumor cerebri, and

16   bilateral knee pain.  AR 334.  Plaintiff symptoms included an increased heart rate, dizziness,

17   lightheadedness, tingling in her hands and feet, feeling weak, and extreme headaches with blurred

18   vision. AR 334-335.  Plaintiff was described as morbidly obese, with slowed movements due to obesity

19   and leg pain.  AR 336.  Plaintiff was able to walk short distances without an assistive device, but used a

20   motorized scooter for additional mobility.  *Id*.  Plaintiff's mental condition was described as clear, alert,

21   and oriented.  *Id*.  Her immediate and remote memory was described as intact, as Plaintiff was able to

22   recall present and past events clearly.  *Id*.

23          Dr. Kamal diagnosed Plaintiff with postural orthostatic tachycardia that limited her daily

24   abilities and increased factors of obesity due to decreased energy output; pseudo tumor cerebri which

25   was stable and managed with medication; and bilateral knee degenerative joint changes moderate in

26   severity and aggravated with underlying obesity.  AR 339.  Based on Dr. Kamal's assessment of

27   Plaintiff, he determined she could (1) carry or lift twenty pounds occasionally or ten pounds frequently,

28   (2) walk or stand two hours in an eight hour day, and (3) sit eight hours in an eight hour workday.  *Id*.

1    Dr. Kamal found Plaintiff could occasionally: climb ramps or stairs, ladders or scaffolds, balance, stoop

2    or bend, kneel, crouch or squat, and crawl.  AR 340.  Dr. Kamal found Plaintiff was not limited in any

3    of the following activities: reaching, fingering, handling objects, hearing, seeing, speaking, or traveling.

4    *Id.*  However, Dr. Kamal did find that environmental restrictions should be placed on Plaintiff that

5    included heights and moving machinery.  *Id.*

6                        **8.    Nevada Imaging Centers**

7         On December 8, 2010, Plaintiff was referred by Dr. Edgar Evangelista to the Nevada Imaging

8    Centers for persistent neck pain.  AR 376.  A CT scan of Plaintiff was performed and found "a mild

9    straightening of the normal cervical lordosis.  The intervertebral spaces were well preserved and there

10   was no evidence of significant intervertebral disc bulge or protrusion. No significant narrowing of the

11   spinal canal or neural foramina was noted."  *Id.*  Doctors further noted that there were five lumbar type

12   vertebrae with normal alignment, and no lumbar vertebral compression deformities or osseous

13   destructive lesions.  AR 377.  As a result of the test, the doctor determined there was "facet arthropathy

14   and L5-S1 left dorsolateral-medial foraminal disc osteophyte complex associated with mild left neural

15   foraminal stenosis."  AR 377.

16                        **9.    Dr. Gobinder Chopra**

17        On September 30, 2011, Dr. Gobinder Chopra completed a treating physician questionnaire for

18   Plaintiff.  AR 368.  Dr. Chopra diagnosed Plaintiff and listed her symptoms as acute dizziness, gait

19   ataxia, degenerative disc disease, knee arthritis, and post thyroid excisim.  *Id.*  Dr. Chopra noted that the

20   impairments were expected to last at least twelve months.  *Id.*  Dr. Chopra also noted that Plaintiff was

21   not capable of performing even "low stress" jobs and that her symptoms were severe enough to interfere

22   with her attention and concentration frequently.  AR 369.

23   **III.    The ALJ's Decision.**

24        The ALJ followed the five-step sequential evaluation process set forth at 20 C.F.R. §§ 404.1520

25   and 416.920 and issued an unfavorable decision on November 21, 2011.  AR 10-23.  At step one, the

26   ALJ found Plaintiff had not engaged in SGA since May 25, 2010.  At step two, the ALJ found Plaintiff

27   had the following severe impairments: pseudo tumor cerebri, hypothyroidism, morbid obesity, and

28   bilateral degenerative joint disease of the knees.  AR 15.  In making his findings at step two, the ALJ

1   specifically considered all of Plaintiff's medically determinable impairments, including her non-severe

2   impairments of low back pain, vertigo, peripheral neuropathy, history of ankle fracture, heal spurs,

3   thyroidectomy, Grave's disease, and migraine headaches.  AR 16.  He concluded that her non-severe

4   impairments did not cause more than minimal limitation in Plaintiff's ability to perform basic work

5   activities.  *Id.*  At step three, the ALJ concluded that Plaintiff did not have an impairment or

6   combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R.

7   Part 404, Subpart P, Appendix 1 (20 CFR §§ 416.920(d), 416.925 and 416.926).  *Id.*

8          The ALJ concluded Plaintiff had the RFC to perform sedentary work, as defined in 20 CFR §

9   416.967(a), except that Plaintiff must never work around hazards and temperature extremes.  AR 16.

10   The ALJ found that Plaintiff's medically determinable impairments could be reasonably found to have

11   caused the alleged symptoms.  AR 17.  However, Plaintiff's statements concerning intensity,

12   persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent

13   with the residual functional capacity assessment.  *Id*.  The ALJ found that the weight of evidence

14   reflected that Plaintiff was able to perform most basic work activities.  *Id.*

15          The ALJ found Plaintiff less than fully credible for multiple reasons.  *Id.*  First, Plaintiff's work

16   history was sporadic prior to the onset date which raised questions as to whether her continued

17   unemployment was actually due to medical impairments.  *Id*.  Second, Plaintiff's daily activities, such

18   as caring for her children at home, which were both physically and emotionally demanding, were not

19   limited to the extent one would expect given the complaints of her disabling symptoms.  *Id.*  The ALJ

20   determined that Plaintiff's symptoms from pseudo tumor cerebri were controlled with medication and

21   therefore did not demonstrate the limitations alleged by Plaintiff.  *Id.*  The ALJ also found that

22   Plaintiff's deep vein thrombosis and orthostatic hypotension were stable according to her own medical

23   records.  *Id.*  Additionally, the ALJ stated Plaintiff's pain from arthritis in her knees was controlled with

24   treatment, that her ankle fracture was minor as evidenced by the fact that Plaintiff did not require

25   casting or surgery, and the record on her heal spur did not contain objective findings to support her

26   allegations of disabling symptoms.  AR 17-18.  With regard to Plaintiff's obesity and vertigo, the ALJ

27   found insufficient evidence in the record to demonstrated the alleged limitations.  AR 18.  Likewise, the

28   / / /

ALJ stated the objective findings did not show that Plaintiff's hypothyroidism prevented her from performing all basic work activities. *Id*.

As for opinion evidence, the ALJ found Dr. Chopra's treating physician questionnaire, which stated Plaintiff's conditions made her incapable of even "low stress" jobs, was less than persuasive. AR 18. The ALJ cited the following factors in determining Dr. Chopra's statement. First, the doctor had minimal treatment notes from which he drew his medical conclusions. *Id*. Second, the objective findings in the record were inconsistent with Dr. Chopra's medical statement. *Id*. For example, imaging studies of Plaintiff's spine show that it was normal and that her medical conditions were controlled with medication. *Id*. Third, The ALJ limited Dr. Chopra's opinion regarding Plaintiff's tolerance for work stress and her capacity to maintain attention and concentration because the ALJ believed the opinion to be an assessment outside the doctor's area of expertise. *Id*.

At step five, the ALJ found Plaintiff was not capable of performing her PRW as cashier pursuant to (20 C.F.R. § 416.965). AR 19. The ALJ relied on Vocational Expert Bernard Preston who testified that Plaintiff was unable to perform her past relevant work. *Id*. However, after consideration of the entire record, the ALJ concluded that Plaintiff had the RFC to perform a full range of sedentary work. *Id*. The ALJ considered the following in making this finding. First, that Plaintiff was thirty-two years old on the date the application was filed, which makes her a younger individual pursuant to 20 C.F.R. § 416.963. *Id*. Second, that Plaintiff had a high school education and was able to communicate in English (20 C.F.R. § 416.964). *Id*. Third, the transferability of Plaintiff's job skills was not an issue because Plaintiff's past work was considered unskilled pursuant to 20 C.F.R. § 416.968. *Id*. Last, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers that Plaintiff could perform (20 C.F.R. §§ 416.969 and 416.969(a)). *Id*. The ALJ based this opinion on evidence provided by vocational expert Bernard Preston who testified that Plaintiff would be able to perform the requirements of call out operator, order clerk, and information clerk. AR 19-20. Based upon all of these findings, the ALJ concluded that Plaintiff was not disabled and denied her application for SSI benefits.

/ / /

/ / /

## IV.     The Parties' Positions.

### 1.     Plaintiff's Position

Plaintiff seeks reversal and remand on the basis that the ALJ impermissibly rejected Dr. Chopra's opinion as a treating physician.  Relying on *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989), Plaintiff argues a treating physician's opinion is entitled to special weight because a treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual.  Furthermore, Plaintiff contends that if a treating physician's opinion is controverted by another doctor, then that opinion may be rejected only if the ALJ makes findings setting forth the specific and legitimate reasons that are based on the substantial evidence of record.  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Magallanes*, 881 F.2d at 751; *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).

Plaintiff asserts the ALJ's articulated reasons for denial of benefits are legally insufficient and/or factually flawed.  First, Plaintiff states that the ALJ's finding that her back is "essentially normal" is not supported by a December 8, 2010, CT scan that showed"facet arthropathy of L5-S1 left dorsolateral-medial foraminal disc osteophyte complex associated with mild left neural foraminal stenosis."  Second, Plaintiff states the exhibits cited by the ALJ do not support his assertion that Plaintiff's condition is controlled by medication.  Third, the ALJ does not explain why his opinion is correct and Dr. Chopra's is not.  Last, the ALJ's reason for rejecting Dr. Chopra's opinion regarding Plaintiff's attention, concentration and tolerance for pain, was flawed.  The ALJ rejected Dr. Chopra's diagnosis on the basis that Dr. Chopra is not a psychiatrist or psychologist and therefore cannot diagnose the mental condition of his patient.  Plaintiff argues the Ninth Circuit has rejected this reasoning and ruled a treating physician's opinion on the mental status of his patient constitutes competent psychiatric evidence, even though the physician is not a psychiatrist.  *Lester v. Charter*, 81 F.3d 821, 833 (9th Cir. 1996) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987)).

Thus, Plaintiff argues the reasons rejecting Dr. Chopra's medical opinion was not sufficient.  Plaintiff asserts Dr. Chopra's opinion should be credited "true as a matter of law" because the ALJ improperly rejected his opinion.  Plaintiff therefore seeks reversal for the immediate payment of benefits, or alternatively remand for further proceedings.

1    **2.      Defendant's Position**

2        The Commissioner responds that the ALJ considered Dr. Chopra's opinion, provided several

3    specific reasons for discounting his opinion, and that Plaintiff failed to identify any error made by the

4    ALJ.  For these reasons, the Commissioner contends the ALJ's decision should be upheld.  The

5    Commissioner contends that when the ALJ rejects a treating physician's opinion, the ALJ must give

6    good reasons that are supported by substantial evidence (20 C.F.R. § 416.927(d)(2)).

7        Here, the ALJ gave three reasons for discounting Dr. Chopra's opinion.  First, the objective

8    evidence did not support Dr. Chopra's opinion.  The ALJ found minimal treatment notes supported Dr.

9    Chopra's restrictive assessment of Plaintiff's functional capacity.  The Commissioner argues these

10   findings are a proper basis for discounting the opinion of a treating physician.  20 C.F.R.

11   § 416.927(d)(2); *Molina v. Astrue*, 674 F.3d 1104, 1111-12 (9th Cir. 2012); *Batson v. Comm'r of Soc.*

12   *Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2004).  Second, the ALJ's conclusion that treatment history,

13   showing Plaintiff's conditions were controlled with medication, were inconsistent with Dr. Chopra's

14   opinion.  The Commissioner contends that Plaintiff's summary of evidence on this position is

15   inaccurate because it omits evidence of her improvement on medication, to which the ALJ referred. The

16   Commissioner cites to several reports throughout the record that report Plaintiff was "doing very well"

17   on certain medications with regard to her various conditions.

18       Last, the ALJ concluded that Dr. Chopra's opinion regarding Plaintiff's mental health

19   limitations deserved little weight because there was insufficient evidence on the record to support such

20   a finding.  The Commissioner contends the record contains no evidence that Plaintiff sought treatment

21   for concentration problems or stress.  The only record of mental limitation is Dr. Chopra's opinion that

22   Plaintiff could not even tolerate "low stress" jobs because her symptoms were severe enough to

23   interfere frequently with her attention and concentration.  The Commissioner does not contend that

24   opinions outside a physician's area of expertise are never entitled to weight, only that in this case, Dr.

25   Chopra's particular mental health findings have no support in the record other than the questionnaire he

26   completed.  The Commissioner argues the cases cited by Plaintiff that hold a physician's opinion about

27   a Plaintiff's mental health may not be disregarded because the physician was not a mental health

28   specialist, are distinguishable from this case.  In both of those cases, the physicians offering mental

health opinions were actually treating their patients for psychiatric conditions, whereas in the present case, the record contains no evidence that Dr. Chopra treated Plaintiff for any mental impairment.

The Commissioner also contends that the opinion of Dr. Khalid A. Kamal conflicts with Dr. Chopra's opinion and is substantial evidence supporting the ALJ's finding of no disability.  Dr. Kamal diagnosed Plaintiff with "pseudo tumor cerebri, stable and managed with medication," bilateral knee degenerative joint disease, and postural orthostatic tachcardia/ orthostatic hypertension. Notwithstanding these conditions, Dr. Kamal concluded Plaintiff could walk short distances, sit comfortably without shifting, stand up from a sitting position and sit up from a supine position with difficulty, lift and/or carry twenty pounds occasionally,  lift and/or carry ten pounds frequently, walk or stand for two hours in an eight hour day, and sit for eight hours in an eight hour work day.  These findings are evidence that support the ALJ's decision to deny SSI benefits.  The Commissioner's final decision should therefore be affirmed.

**V.**    **Analysis and Findings**

Reviewing the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion, the court finds the ALJ's decision is supported by substantial evidence, and the ALJ did not commit legal error.  It is undisputed that Plaintiff was not engaging in substantial gainful activity at the time she applied for disability benefits.  Plaintiff argues the ALJ erred in rejecting Dr. Gobinder Chopra's opinion.

**1.**    **ALJ's Rejection of Dr. Chopra's Opinion.**

Plaintiff asserts the ALJ improperly rejected the opinion of Plaintiff's treating physician, Dr. Gobinder Chopra, that Plaintiff was disabled and unable to perform work of any kind.  The implementing regulations for Title II of the Social Security Act distinguish among the opinions of three types of physicians: first, treating physicians; second, examining physicians (*i.e.,* physicians who examine but do not treat a claimant); and third, non-examining or reviewing physicians (*i.e.,* physicians who neither examine nor treat the claimant, but review the claimant's file).  *Lester v. Chater*, 81 F.3d 821, 830 (9th Circuit 1995); 20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than an examining physician's, and an examining physician's opinion is entitled to more weight than a reviewing physician's.  *Lester*, 81 F.3d at 830; 20 C.F.R. § 404.1527(d).  The

1   Social Security Regulations give more weight to opinions that are explained than those that are not.  20

2   C.F.R. § 404.1527(d)(3).  The Social Security Regulations also give more weight to opinions of

3   specialists concerning matters relating to their specialty over that of non-specialists.  20 C.F.R.

4   § 404.1527(d)(5).

5       The ALJ must consider all medical evidence.  *See* 20 C.F.R. § 404.1527(b).  Here, the ALJ

6   provided a detailed and thorough summary of the medical evidence, providing his interpretation and

7   making detailed findings.  He considered Dr. Chopra's opinion but afforded it "little weight."  AR 18.

8   For the following reasons, the court finds the ALJ provided clear and convincing reasons for rejecting

9   Dr. Chopra's opinion which were supported by substantial evidence in the record.  First, the ALJ

10  properly concluded that a treating physician's opinion on the ultimate issue of disability is not binding

11  on the Commissioner.  *See* SSR 96-5p; 20 C.F.R. § 404.1527(e)(1).  Second, the ALJ acknowledged

12  Dr. Chopra was a treating source, but found the doctor's opinion was not supported by the record as a

13  whole.  AR 18.  An ALJ is not required to accept the opinion of any physician, including a treating

14  physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.  *Bray v.*

15  *Comm'r,* 554 F.3d 1219, 1228 (9th Cir. 2009).  Here, on September 30, 2011, Dr. Chopra's completed a

16  treating physician questionnaire that was a three-page check-the-box form with fill-in the blank.  AR

17  367-370.  The form had no documentation to support Dr. Chopra's findings that Plaintiff was

18  "incapable of even low stress jobs" and it merely stated a conclusion.

19      Third, the ALJ rejected Dr. Chopra's opinion because it was inconsistent with other doctors'

20  treatment notes that reflected Plaintiff improved with treatment.  AR 16-19.  When an ALJ rejects a

21  treating physician's opinion that is contradicted by another doctor, the ALJ must provide specific,

22  legitimate reasons based on substantial evidence in the record.  See *Valentine v. Comm'r of Soc. Sec.*

23  *Admin.,* 574 F.3d 685, 692 (9th Cir. 2009); *Ryan v. Comm'r of Soc. Sec. Admin.,* 528 F.3d 1194, 1198

24  (9th Cir. 2008).  An ALJ satisfies the burden of providing specific, legitimate reasons to reject a

25  controverted treating physician opinion where he or she sets out a "detailed and thorough summary of

26  the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."

27  *Magallanes v. Bowen*, 881 F.2d 747, 757 (9th Cir. 1989).  Here, the ALJ referred to records from

28  Sunrise Medical Center, which demonstrate Plaintiff was discharged after pain medication was

1    administered for pain in her right leg.  (AR 184-185).  Regarding Plaintiff's deep vein thrombosis,

2    Plaintiff was discharged in stable condition after reporting that she "felt better." *Id.*  The ALJ also

3    referred to a report from Sunrise Hospital and primary care physician Teresa Charniga that stated

4    Diamox was effective in treating Plaintiff's pseudo tumor cerebri, which was a chief medical

5    complaint, and that she reported "her headache almost completely resolved" when using the

6    medication.  AR 173, 213.  Another record referred to by the ALJ was from Nevada Cardiology

7    Associates that showed Plaintiff felt better after taking Metoprolol to regulate blood pressure.  AR 348,

8    358, 360. Impairments that can be treated effectively are not disabling.  See *Warre v. Comm'r of Soc.*

9    *Sec.*, 439 F.3d 1001, 1006 (9th Cir. 2006).   These records support the ALJ's finding that Plaintiff's

10   conditions were controlled with medication.

11        Fourth, the ALJ properly concluded that Dr. Chopra's opinion regarding Plaintiff's mental

12   health limitations deserved little weight.  The record contains no evidence that Plaintiff sought

13   treatment for concentration problems or stress.  The only record of mental limitation is Dr. Chopra's

14   opinion that Plaintiff could not even tolerate "low stress" jobs because her symptoms were severe

15   enough to interfere frequently with her attention and concentration.  Opinions outside a physician's area

16   of expertise are entitled to some weight if the physician is actually treating the patient for the condition.

17   However, outside of Dr. Chopra's opinion that Plaintiff was incapable of holding even a low stress job,

18   there are no others records that support his conclusion.  The cases cited by Plaintiff that hold a

19   physician's opinion about a Plaintiff's mental health may not be disregarded because the physician was

20   not a mental health specialist, are distinguishable from this case.  See *Lester v. Charter*, 81 F.3d 821,

21   833 (9th Cir. 1996) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987)).  In both of those

22   cases, the physicians offering mental health opinions were actually treating their patients for psychiatric

23   conditions.  The record contains no evidence that Dr. Chopra treated Plaintiff for any mental

24   impairment.  Thus, the ALJ provided specific and legitimate reasons to reject Dr. Chopra's mental

25   health opinion.

26   **VI.    Conclusion**

27        Judicial review of a decision to deny disability benefits is limited to determining whether the

28   decision is based on substantial evidence reviewing the administrative record as a whole.  If the record

20

1    will support more than one rational interpretation, the court must defer to the Commissioner's

2    interpretation.  If the evidence can reasonably support either affirming or reversing the ALJ's decision,

3    the court may not substitute its judgment for the ALJ's.  *Flaten v. Sec'y of Health and Human Serv.,* 44

4    F.3d 1453, 1457 (9th Cir. 1995).  It is the ALJ's responsibility to make findings of fact, drawing

5    reasonable inferences from the record as a whole, and to resolve conflicts in the evidence and

6    differences of opinion.  Having reviewed the Administrative Record as a whole, and weighing the

7    evidence that supports and detracts from the Commissioner's conclusion, the court finds that the ALJ's

8    decision is supported by substantial evidence under 42 U.S.C. § 405(g).

9            For all of the foregoing reasons,

10           **IT IS RECOMMENDED**:

11           1.      Plaintiff's Motion to Remand (Dkt. #14) be DENIED.

12           2.      The Commissioner's Cross-Motion to Affirm (Dkt. #15) be GRANTED.

13           Dated this 12th day of September, 2014.

14

15                                                    _____
                                                     Peggy A. Leen
16                                                   United States Magistrate Judge

21